J-A09009-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| S.M.D. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| D.A. | : | |
| | : | |
| Appellant | : | No. 183 WDA 2017 |

Appeal from the Order January 4, 2017
In the Court of Common Pleas of Butler County Domestic Relations at
No(s): 37804

BEFORE: BOWES, J., DUBOW, J., and MURRAY, J.

MEMORANDUM BY BOWES, J.: FILED JANUARY 16, 2019

D.A. (Father) appeals from the January 4, 2017 order that vacated the trial court's earlier order granting reconsideration of the findings of fact that informed its child support order. We affirm in part, reverse in part, and remand for further proceedings consistent with this memorandum.

Father and S.M.D. (Mother) married in 2011 after having two children, M.A. (born in 2008) and L.A. (born in 2010) ("Children," collectively). Father owned and operated a beauty salon in Wexford, Pennsylvania, where Mother worked as a stylist and manager until the parties' younger child was born. In 2013, Father sold the marital residence with little notice to Mother. Mother and Children moved to California with the expectation that Father would follow. Mother and Children remained in California for approximately one year, Father did not relocate to California, and Mother and Children returned to Pennsylvania in July 2014. Mother filed for divorce in February 2015.

Father opened a second salon in California, travelling back and forth between the two salons, but spending the majority of his time in California.

An initial support order was entered in April 2015. Father filed for a de novo hearing. That hearing was continued multiple times at the request of one party or the other, and was eventually conducted over three days: February 29, 2016, May 23, 2016, and August 12, 2016. During the pendency of the de novo hearing, Father closed his Wexford salon.

The trial court entered its findings of fact and support order on November 23, 2016.[1] Therein, the court determined that Father's net monthly income is $12,722 and Mother's is $1,176. The court, accordingly, ordered Father to pay $2,235 per month in child support and the majority of expenses related to Children's extracurricular activities.

Father presented a motion for reconsideration, which the trial court granted by order filed on December 23, 2016. After determining that the order was entered in error because it intended to deny the motion, the trial court entered an order on January 4, 2017, vacating the grant of reconsideration. Father filed a notice of appeal on January 25, 2017. The trial court ordered Father to file a concise statement of errors complained of on appeal, and Father timely complied. Therein, Father raised eight issues

_____

[1] The findings of fact are dated November 18, 2016, and the support order is dated November 21, 2016. Both documents were filed on November 23, 2016.

- 2 -

concerning the trial court's factual findings and support order of November 23, 2016. In its Pa.R.A.P. 1925(a) opinion, the trial court expressed its belief that Father's challenges to the November 23, 2016 determinations were untimely.

On February 13, 2017, this Court issued a rule to show cause why the appeal should not be quashed as untimely. Father filed a response suggesting that the appeal was timely filed because he filed it within thirty days of the trial court's final resolution of the issues following its express grant of Father's motion for reconsideration. Mother responded with an argument that the appeal was untimely, as the trial court's order granting reconsideration referenced only the findings of fact, and did not grant reconsideration of the support order based upon those findings. This Court discharged the rule, without making a final determination of the timeliness of the appeal. Mother filed an application to quash the appeal, relying on the reasons detailed above. The appeal was then stayed after Father filed for bankruptcy. After the stay was lifted, this Court again declined to quash the appeal without prejudice for the issue to be raised before this panel.

In her brief, Mother again advocates for quashal of Father's appeal as untimely because Father never requested reconsideration of the support order. Mother's brief at 7. Mother contends that, as a result, to challenge the November 23, 2016 support order, Father was required to have appealed within thirty days, i.e., by December 23, 2016. Id. As Father did not file his

- 3 -

notice of appeal until January 25, 2017, Mother argues that it must be quashed as untimely. Id.

Our review of the record reveals that the appeal is not untimely, as the docket report certified to this Court does not contain a notation that the support order was served upon the parties pursuant to Pa.R.C.P. 236. As we have explained,

> Rule of Appellate Procedure 108(b) designates the date of entry of an order as the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b). Our Supreme Court has held that an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given. Where there is no indication on the docket that Rule 236(b) notice has been given, then the appeal period has not started to run. Our Supreme Court has expressly held that this is a bright-line rule, to be interpreted strictly. That the appealing party did indeed receive notice does not alter the rule that the 30–day appeal period is not triggered until the clerk makes a notation on the docket that notice of entry of the order has been given.

In re L.M., 923 A.2d 505, 508–09 (Pa.Super. 2007) (citations, internal quotation marks, and emphases omitted).

Accordingly, we cannot quash Father's appeal as untimely in the absence of the proper docket notation. Rather, the appeal is technically premature. However, we shall not waste judicial resources remanding the case for a docket entry, but shall proceed to the merits of Father's appeal. Vertical Res., Inc. v. Bramlett, 837 A.2d 1193, 1199 (Pa.Super. 2003) (considering appeal as timely despite the improper entry of the appealed-from

order, where "it would be a waste of judicial resources to remand the matter solely for the filing of a Pa.R.Civ.P. 236 notice").

Father presents the following questions for this Court's review, which we have reordered for ease of disposition.

> [1]. Whether the trial court erred in calculating Appellant's income.
>
> [2]. Whether the trial court erred in determining Appellee's earning capacity.
>
> [3]. Whether the trial court abused its discretion in calculating the costs of extracurricular activities.

Appellant's brief at 5.

The following principles guide our consideration of Father's first two issues.

> The amount of a support Order is within the sound discretion of the trial judge, whose judgment will not be disturbed on appeal absent a clear abuse of discretion. An abuse of discretion is not merely an error of judgment, but rather a misapplication of the law or an unreasonable exercise of judgment.

Calabrese v. Calabrese, 670 A.2d 1161, 1162 (Pa.Super. 1996) (citations omitted).

Under our rules of civil procedure, "the amount of support to be awarded is based upon the parties' monthly net income." Pa.R.C.P. 1910.16-2. The calculation of income is guided by the following parameters.

> (a) Monthly Gross Income. Monthly gross income is ordinarily based upon at least a six-month average of all of a party's income. The term "income" is defined by the support law, 23 Pa.C.S.A. § 4302, and includes income from any source. The statute lists many types of income including, but not limited to:

(1) wages, salaries, bonuses, fees and commissions;

(2) net income from business or dealings in property;

(3) interest, rents, royalties, and dividends;

(4) pensions and all forms of retirement;

(5) income from an interest in an estate or trust;

(6) Social Security disability benefits, Social Security retirement benefits, temporary and permanent disability benefits, workers' compensation and unemployment compensation;

(7) alimony if, in the discretion of the trier of fact, inclusion of part or all of it is appropriate; and

(8) other entitlements to money or lump sum awards, without regard to source, including lottery winnings, income tax refunds, insurance compensation or settlements; awards and verdicts; and any form of payment due to and collectible by an individual regardless of source.

. . . .

(c) Monthly Net Income.

(1) Unless otherwise provided in these rules, the court shall deduct only the following items from monthly gross income to arrive at net income:

> (A) federal, state, and local income taxes;

> (B) unemployment compensation taxes and Local Services Taxes (LST);

> (C) F.I.C.A. payments (Social Security, Medicare and Self-Employment taxes) and non-voluntary retirement payments;

> (D) mandatory union dues; and

> (E) alimony paid to the other party.

(2) In computing a spousal support or alimony pendente lite obligation, the court shall deduct from the obligor's monthly net income all of his or her child support obligations and any amounts of spousal support, alimony pendente lite or alimony being paid to former spouses.

(d) Reduced or Fluctuating Income.

(1) Voluntary Reduction of Income. When either party voluntarily assumes a lower paying job, quits a job, leaves employment, changes occupations or changes employment status to pursue an education, or is fired for cause, there generally will be no effect on the support obligation.

(2) Involuntary Reduction of, and Fluctuations in, Income. No adjustments in support payments will be made for normal fluctuations in earnings. However, appropriate adjustments will be made for substantial continuing involuntary decreases in income, including but not limited to the result of illness, lay-off, termination, job elimination or some other employment situation over which the party has no control unless the trier of fact finds that such a reduction in income was willfully undertaken in an attempt to avoid or reduce the support obligation.

. . . .

(4) Earning Capacity. If the trier of fact determines that a party to a support action has willfully failed to obtain or maintain appropriate employment, the trier of fact may impute to that party an income equal to the party's earning capacity. Age, education, training, health, work experience, earnings history and child care responsibilities are factors which shall be considered in determining earning capacity. In order for an earning capacity to be assessed, the trier of fact must state the reasons for the assessment in writing or on the record. Generally, the trier of fact should not impute an earning capacity that is greater than the amount the party would earn from one full-time position. Determination of what constitutes a reasonable work regimen depends upon all relevant circumstances including the choice of jobs available within a particular occupation, working hours, working conditions and whether a party has exerted substantial good faith efforts to find employment.

Pa.R.C.P. 1910.16-2.

Father first contends that the trial court abused its discretion in calculating his income. He argues that, rather than base it upon his prior tax returns, the trial court should have utilized Father's actual cash flow in rendering its income calculation. Father's brief at 20-21. He maintains that his businesses "suffered a downturn," resulting in the closure of the Wexford salon, and rendering inapt an income determination based upon his earnings while both business were operating. Id. at 26. Father suggests that he should not be punished for the failure of his reasonable attempts at expanding his businesses, and cites as evidence of the trial court's abuse of discretion the facts that he is saddled with significant arrearages and filed for bankruptcy after the trial. Id. at 27. Finally, Father avers that the trial court's calculation of his income was incorrect based upon its failure to properly account for Groupon sales, and its determinations that Father abandoned assets of the Wexford salon and received unreported tip income. Id. at 27-29.

Father is correct that, "in determining the financial responsibilities of the parties to a dissolving marriage, the court looks to the actual disposable income of the parties." Fennell v. Fennell, 753 A.2d 866, 868 (Pa.Super. 2000) (cleaned up). Thus, the court's finding as to income "must reflect actual available financial resources and not the oft-time fictional financial picture created by the application of federal tax laws." Id. (internal quotation marks omitted).

However, as noted above, if a party's actual income is the product of voluntary underemployment, the court is to assign an income based upon the party's earning capacity rather than his or her disposable income. Pa.R.C.P. 1910.16-2(d). Additionally, where a party owns his or her own business,

> the calculation of income for child support purposes must reflect the actual available financial resources of the payor spouse. Further, all benefits flowing from corporate ownership must be considered in determining income available to calculate a support obligation. Therefore[,] the owner of a closely-held corporation cannot avoid a support obligation by sheltering income that should be available for support by manipulating salary, perquisites, corporate expenditures, and/or corporate distribution amounts.

Spahr v. Spahr, 869 A.2d 548, 552 (Pa.Super. 2005) (cleaned up).

Both the Wexford and the California salons were Subchapter S corporations wholly owned by Father, meaning that the net income of the businesses passed through to Father and were attributable to Father for tax purposes. N.T. De Novo Hearing, 2/29/16, at 33-34. Mother and Father each offered experts who compared the 2014 and 2015 reported earnings of the companies with the trading summary reports that showed the flow of money into the companies. Id. at 22-25, 33. The experts analyzed the net profits or losses of the companies, the amount of tip income attributable to Father, and the income he received in the form of perquisites.

Specifically, Mother's expert review of the materials led her to conclude that the gross earnings attributable to services Father provided as a stylist in Wexford in 2014 was $224,925, which is over $50,000 more than Father

reported on his income tax return. Id. at 14-15, 24. The difference can be explained by the cash and checks that records show were received by the company, but which "did not appear to all make it to the bank." Id. at 25. Father reported $6,750 in tips that year, representing 3% of his gross income.[2] Id. at 17. Mother's expert also included in disposable income available to Father in 2014 the $28,273 that Father received from the Wexford company as repayment of a shareholder loan, and the $51,257 that Father advanced to the California company from the Wexford company. Id. at 21. It was the opinion of Mother's expert that, after consideration of all taxes, Father's 2014 net income was $144,060, or $12,005 per month. Id. at 27.

As for 2015, when Father split his time between both salons, his gross income from stylist services was $146,341, approximately $87,000 of which came from Wexford and $59,000 from California.[3] Id. at 15. Father acknowledged $2,250 in tips in 2015, or 1.5% of his gross salon services. Id. at 18. Father received $59,035 in "shareholder loan advances" from the Wexford salon in 2015, and the salon also forwarded $39,276 to the California

_____

[2] Mother's expert utilized only the amount of tips Father reported in making her calculations, although she opined that the industry average for cash tips is 10-15% of gross sales. N.T. De Novo Hearing, 2/29/16, at 19. Tips were only permitted to be given in cash at the salon, not though charge accounts. Id. at 17.

[3] The difference in 2015 between the trading summary and the bank deposits was only $4,425. Id. at 25. During this time someone other than Father was making the daily deposits. N.T. De Novo Hearing, 2/29/16, at 26.

company. Id. at 22. A comparison of the trading summaries and management reports also revealed an additional $20,625 of undistributed corporate income. Id. at 26-27. From this, Mother's expert opined that Father's after-tax income in 2015 was $98,273, or $8,189 per month.

Father's expert testified only to Father's 2015 income. She indicated that the reported tip income should have been 15% of the gross services Father provided,[4] or approximately $22,000, as opposed to the $2,250 he documented. Id. at 35. Father's expert further detailed the value of perquisites attributable as income to Father: $7,478 in travel, $4,875 for a car lease, and approximately $20,000 in divorce attorney fees paid by the salons. Id. at 38. She concluded, in marked contrast to Mother's expert, that there was a mere $2,513 income in 2015 between the two salons, given the equipment purchases made by the California salon and its long-term liabilities.[5] Id. at 37. Father's expert also expressed the opinion that Groupon sales explained the difference noted by Mother's expert between the gross revenue figure reported in the trading summary and the figure indicated in the profit/loss statement: "they book the Groupon sales at the gross amount so that the individual stylists get paid on the gross tips," but that "what they actually realize may be" half of the gross amount or less. Id. at 39. Father's

_____

[4] Father's expert indicated that tip income is 15 to 20%; she utilized 15% in her calculations given that Father was the salon's owner. Id. at 35.
[5] Father's expert did not testify to the repayment schedule regarding these liabilities.

expert ultimately concluded that Father's 2015 disposable income was $55,774, or $4,648 per month. Id. at 38.

The trial court made the following factual findings regarding Father's income. For 2014, the trial court adopted the value that Mother's expert offered as Father's net income ($144,060), and added the 15% tip income that Father's expert opined should be attributed to his stylist services ($36,739), arriving at total disposable income of $180,799, or $15,067 per month. Findings of Fact, 11/23/16, at 6. Similarly, for 2015, the trial court accepted the net salon income of $98,273 indicated by Mother's expert, added $54,386 for 15% tip income and the perquisites identified by Father's expert, and arrived at a net disposable income of $152,659, or $12,722 per month. Id. at 6-7. Clearly the trial court's findings have support in the record, as it adopted the portions of each expert's opinions that it found credible. Such was the prerogative of the trial court in its role as fact finder. See, e.g., Mackay v. Mackay, 984 A.2d 529, 533 (Pa.Super. 2009) ("When the trial court sits as fact finder, the weight to be assigned the testimony of the witnesses is within its exclusive province, as are credibility determinations, and the court is free to choose to believe all, part, or none of the evidence presented.") (cleaned up).

Further, the trial court did not abuse its discretion in concluding that Father was not entitled to a downward deviation. As the trial court noted, Father resides with his sister in California rent-free. Findings of Fact,

11/23/16, at 7. Father points to no record evidence that his income moving forward operating only the California salon will, for reasons beyond his control, be substantially less than his 2014 and 2015 income on a continuing basis such that his support obligations should be reduced under Pa.R.C.P. 1910.16-2(d)(2). His complaints about his financial woes that have arisen after the conclusion of the de novo hearing, see Father's brief at 27, are fodder for a later motion for modification pursuant to Pa.R.C.P. 1910.19, not a basis for this Court to find an abuse of discretion.[6] Accordingly, Father has not persuaded us that we have cause to disturb the trial court's calculation of his income.

_____

[6] Moreover, the evidence showed that the "downturn" suffered by his businesses was of his own creation rather than "substantial continuing involuntary decreases in income" not under his control. It was Father's choice to invest his disposable income from the Wexford salon in a new, separate company; the Wexford salon had no obligation to pay the debts of the California salon. N.T. De Novo Hearing, 2/29/16, at 20. Father laments that "he was ultimately forced to close [the Wexford salon] in 2016 due to the financial burden both salons placed on him and the resulting dissatisfaction of his employees." Father's brief at 10. However, the evidence discussed above showed that the Wexford salon was profitable prior to Father's decision to close it. Mother also offered evidence to show that the decision, predating his employees' leaving for new employment, had different motivations. See, e.g., N.T. De Novo Hearing, 5/3/16, at 8 (Father's Wexford landlord testifying that Father told him that he was closing the salon because "he was not getting along with his wife, they were going to get a divorce, he was going to close up and go to California").

Father next contends that the trial court abused its discretion in imputing only a minimum wage income to Mother. On this issue, we agree with Father.

The full extent of the trial court's discussion of its calculation of Mother's income is as follows.

> Mother operates a business called Shade Makeup Artistry offering special occasion beauty services. Mother last worked part-time in May 2013 as a hair stylist for [Father's Wexford salon]. While Father initiated plans to open a second salon . . . in California, and due to his insistence, Mother relocated to California and thereby forfeited her employment in 2013. During that time, Father remained in . . . Pennsylvania, while Mother acted as [C]hildren's full-time caregiver in California. In July 2014, Mother returned to . . . Pennsylvania with [C]hildren. Mother filed for divorce in February 2015. Soon after, Father relocated to California to operate his new salon . . . in late 2015. The [c]ourt does not impute Mother with an earning capacity for 2015 through June 30, 2016, because Mother's involuntary relocations, and, consequently, expanded child-care responsibilities prohibited her from engaging in gainful employment. Further, effective July 1, 2016, the [c]ourt finds Mother has an imputed minimum wage annual earning capacity of $16,000 or $1,176.13 imputed monthly net income, offset by daycare expenses, in that the youngest child is not of full-time school age.

Findings of Fact, 11/23/16, at 3.

Father argues that the trial court did not consider all of the relevant factors in arriving at its conclusion. Father observes that Mother was only thirty-one years old at the time of the hearing and in good health, and the children were ages six and eight. Father's brief at 32. Father notes that the trial court did not address Mother's work history, and maintains that Mother is qualified to earn more than minimum wage. Id. at 33. Father further

protests that the court did not consider Mother's increased ability to obtain employment given that L.M. was soon to be in school for full days. Id. Finally, Father argues that, while Mother was in California with Children, Father's family was available to provide child care at no cost, leaving Mother available to obtain employment. Id.

Mother responds that the trial court justifiably declined to impute an earning capacity until July 2016, in light of Mother's involuntary relocations and Father's failure to follow the family to California. Mother's brief at 14. Regarding the imputation of minimum-wage earning capacity from July 2016 onward, Mother merely states that it was an appropriate assessment by the trial court. Id. at 15.

Mother graduated from high school and completed one year of college. N.T. De Novo Hearing, 5/23/16, at 125. She completed cosmetology school and has a current cosmetology license. Id. at 80, 125. Mother worked as a stylist at a salon with Father prior to becoming pregnant with their first child. Id. at 80. She returned to work when the Wexford salon opened. Mother worked as a stylist, doing hair, makeup, manicures, and pedicures. Id. at 110. Mother also served as manager, tending to the scheduling, retail orders, payroll, and client interactions including handling complaints. Id. at 109-12.

Mother started her company in 2015, and markets her business through a website, Instagram, and Facebook. Id. at 89-90. For each booking, usually events such as weddings and senior portraits, Mother works for a few hours

on location. Id. at 90-92. Mother's gross receivables from 2015 amounted to $3,140, and she grossed $3,875 in 2016 as of the end of May. Id. at 91. Mother indicated that she would "do my best" to secure full-time employment once both children were in school full-time, which would begin in the autumn of 2016. Id. at 107, 123.

Although Mother knows many stylists from her prior employment, she has not networked with any to learn of potential open positions commensurate with her experience. Id. at 127-28. She contacted one salon that offered a flexible schedule, but concluded that the $9 per hour wage was insufficient to cover child care expenses. Id. at 128. Mother has not inquired at any other salons. Id. She did look into employment at different makeup counters, "but nothing really panned out." Id. Mother belongs to "[d]ifferent websites for Pittsburgh" to learn of openings, but has not posted her resume online, has not considered customer service positions, and has not explored positions using her experience in payroll management. Id. at 129-30.

From this, we do not see evidentiary support for the trial court's determination that Mother should be imputed with a minimum wage earning capacity. Mother has the education, training, and experience to earn substantially more than minimum wage, but she neglected to pursue any opportunity that would allow her to satisfy her financial obligation to Children. Without a basis in the record for imputing a minimum-wage income to Mother in light of her age, education, training, health, work experience, earnings

history and child care responsibilities, we must conclude that the ruling is unreasonable. See Gephart v. Gephart, 764 A.2d 613, 616 (Pa.Super. 2000) ("[W]here there is insufficient evidence to support the trial court's order, the judgment is manifestly unreasonable.") (internal quotation marks omitted)). Accordingly, we remand for trial court to make an earning-capacity determination for Mother pursuant to Pa.R.C.P. 1910.16-2(d)(4). "If the results of this hearing yield a different conclusion regarding [Mother's] earning capacity, the trial court should modify the monthly support payments to [her] accordingly." Gephart, supra at 616.

Father's final issue is that the trial court erred in calculating costs of Children's extracurricular activities. However, Father's arguments relate not to an error in calculating amounts, but rather claims that (1) he is paying too high a percentage of the costs due to the income miscalculations discussed above, and (2) since the hearing, Children have ceased participating in some of the activities. Father's brief at 30-31.

Addressing the latter contention first, this Court will not accept averments of post-trial changes in circumstances as a basis for disturbing a trial court's order based upon the facts present at that time it was made. If there has been a substantial change in circumstances since the hearings concluded, Father may seek to have the trial court modify the resultant support order pursuant to Pa.R.C.P. 1910.19. Issues not before the trial court

at the time of its decision cannot provide a basis to hold that the decision was an abuse of discretion.

Turning to Father's claim that his share of extracurricular costs is disproportionate, we are remanding for a recalculation of Mother's earning capacity for the reasons discussed above. The trial court should re-calculate the parties' shares of extracurricular costs based upon its new finding as to Mother's earning capacity, allocate the expenses between Mother and Father in proportion to their incomes pursuant to Pa.R.C.P. 1910.16-6(d), and reflect any changes in a new support order.

Order affirmed in part and reversed in part. Case remanded for further proceedings consistent with this memorandum. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/16/2019